

# THE ATTORNEY GENERAL

## OF TEXAS

### AUSTIN 11, TEXAS

PRICE DANIEL
ATTORNEY GENERAL

April 9, 1947

Hon. L. R. Pearson, Chairman
Oil, Gas and Mining Committee
House of Representatives
Austin, Texas

Opinion No. V-97-A

Re: Constitutionality of proposed
Committee Amendment by King
to H.B. 67, permitting pooling
in oil and gas fields; and the
effect of such Act on the Anti-
trust Laws.

Dear Sir:

We have your letter of April 7, 1947, which
reads:

"The Oil, Gas and Mining Committee of
the House of Representatives has instructed
me to withdraw our request of April 3rd for
an opinion on a proposed substitute of H.B.
No. 67, since the authors of the proposed
substitute have prepared a new substitute
bill. The new substitute now before our com-
mittee is by Rep. Leslie King and is attached
hereto.

"The Committee requests that you give us
an opinion as soon as possible on the consti-
tutionality of the attached substitute by King
and your opinion as to whether or not this sub-
stitute would have any adverse effect upon the
validity or enforceability of the Anti-Trust
Laws of Texas."

Because the attached instrument referred to in
your letter is but a proposed Committee Amendment, and in
order that there may be no mistake as to the exact word-
ing to which this opinion applies, we set out in full Sec-
tions 1 and 5, to which your request is directed:

"SECTION 1.  It is hereby declared the public policy of this State to prevent the waste of, and to promote the conservation of oil and gas, and to protect correlative rights therein.  Therefore, when necessary to prevent waste of, and to promote the conservation of oil and gas, and to protect correlative rights therein, it shall be lawful for two or more persons owning, claiming, or controlling production, leases, royalties, or other interests in separate properties in the same oil field, gas field, or oil and gas field, when it appears from geologic or other data that such properties are underlaid by one or more common accumulations of oil or gas, or both, to enter into and perform agreements for Co-operative development and operation of all or any part or parts of such field, for the purposes hereinafter specified in (a) to (d), inclusive, provided, such agreements are approved by the Railroad Commission of Texas, upon application and after notice and hearing, upon a finding by the Commission that they are in the interest of Public welfare as being reasonably necessary to prevent waste, to promote the conservation of oil or gas, and to protect correlative rights.  Provided further that the order of the Railroad Commission shall define the area of the common source of supply or portion thereof to be included within the unit area.  Each unit and unit area shall be limited to all or a portion of a single common source of supply.  Only so much of a common source of supply as has reasonably been defined by development may be so included within the unit area.  Any pooling agreement approved shall provide for addition to the unit of newly developed acreage underlaid by the same common source of supply, provided that the owner or owners of the newly developed acreage and the owners of the established unit so agree, and the Railroad Commission approves as in the original instance.

"Such agreements when so approved by the Railroad Commission may provide:

"(a) For establishing pooled units
necessary to effect secondary re-
covery operations, including
those known as cycling, recycling,
repressuring, water flooding and
pressure maintenance, and for the
location and spacing of input and
producing wells thereon.

"(b) For establishing and operation
co-operative systems for said sec-
ondary recovery operations, or con-
servation and utilization of gas,
which may include facilities for
extracting and separating the hy-
drocarbons from the wet gas (Natur-
al gas or casinghead gas) and re-
turning the dry gas to a formation
underlying any lands or leases com-
mitted to the agreement, and pro-
viding that no royalties are requir-
ed to be paid on gas so returned.

"(c) For the equitable division, on an
agreed basis, of oil and gas pro-
duced therefrom.

"(d) For the extension of leases cover-
ing any part of lands committed
thereto, so long as operations for
drilling or re-working, or so long
as production of oil or gas in pay-
ing quantities is had from any part
of the lands or leases committed
thereto; provided that no such agree-
ment shall relieve any operator from
the obligation to develop reasonably
the lands and leases as a whole com-
mitted thereto.

"No such agreement shall provide for the co-op-
erative marketing or refining of crude petro-
leum, nor shall it provide for the co-operative
refining of gas or any by-product of gas except
the extraction and separation of liquid hydro-
carbons therefrom, nor shall it provide for the
co-operative marketing of gas or by-products of
gas whenever it is possible and practicable,

withour incurring waste, to deliver such gas or by-product in kind to its owners severally.

"All agreements executed hereunder shall be subject to any valid order, rule, or regulation of the Railroad Commission of Texas relating to spacing, proration, conservation, or other matters within the authority of the Railroad Commission, whether promulgated prior, or subsequent to, the execution of such agreement.

"Such agreements shall bind only the persons who execute them, their heirs, successors, assigns, and legal representatives.

"No provisions of this Act shall be construed, however, as requiring the approval of the Railroad Commission of

"(a) voluntary agreements for the joint development and operation of jointly owned properties; or

"(b) voluntary agreements entered into between the operators of tracts or interests in tracts embraced within a production, proration or drilling unit established by the Railroad Commission of Texas to integrate the owners' interests and to develop and operate their lands as a unit; provided however that nothing contained in this Act shall be construed to abrogate or in any manner affect any order, rule, or regulation of the Railroad Commission of Texas relating to spacing, proration, conseveration, or any other matter within the authority of the Railroad Commission, whether promulgated prior, or subsequent to, the executing of such agreement."

"SECTION 5.  Agreements, and operation
thereunder, in accordance with this act, be-
ing necessary to prevent waste, conserve the
natural resources of this State, and to pro-
tect correlative rights, shall not be con-
strued to be in violation of the provisions
of Title 126, Revised Civil Statutes, 1925,
Penal Code of Texas, 1925, as amended, known
as Antitrust Acts.  However, if any court
should find a conflict between this act and
Title 126, Revised Civil Statutes of Texas,
1925, as amended, or Chapter 3, Title 19,
Penal Code of Texas, 1925, as amended, then
this Act is intended as a reasonable excep-
tion thereto, necessary for the above stated
public interests; provided further, that if
any court should find that a conflict exists
between this and the above mentioned Laws,
and that this Act is not a reasonable excep-
tion thereto, then it is the intent of the
Legislature that this Act, or any conflicting
portion  hereof, shall be declared invalid
rather than declaring the above mentioned
Antitrust Laws, or any portion thereof, in-
valid."

This proposed Committee Amendment, which will
be referred to as The King Amendment, makes substantial
changes in H.B. 67 as it was submitted to this depart-
ment on March 5, 1947.  Reference is here made to Attor-
ney General's Opinion Number V-97, of March 21, which
pointed out objections to Committee Amendment No. 1
(hereinafter referred to as the original Bill) from the
standpoint of the antitrust laws.

A principal objection to the original Bill was
that no finding was required that such agreements were
necessary to prevent waste, conserve the natural resourc-
es and to protect correlative rights.  The King Amendment
provides that for such agreements to be lawful, there
must be a necessity therefor; and a finding is required
by the Railroad Commission that they are reasonably neces-
sary in the interest of public welfare to prevent waste,
promote conservation and protect correlative rights.

Another principal objection to the original
Bill was that it allowed co-operative exploration, which
appeared to have little or nothing to do with prevention
of waste and conservation of property.  The King Amend-
ment completely eliminates co-operative exploration.

The original Bill allowed co-operative development and operation without adequate restrictions thereon to insure that such development was in the interest of conservation and waste prevention, rather than for mere convenience and profit. The King Amendment limits co-operative development and operations to specified items set out in the bill. Further in that regard, the former bill stated that such agreement and operations might provide, "among other things. . ." The phrase, "among other things," has been eliminated; so that, under the King Amendment, the purposes are more definitely stated, thus reducing the opportunity for selfish interests to use the bill as a cover for mere convenience or private, monopolistic gain.

The former amendment permitted co-operative refining of gas and by-products of gas, thus opening the door to monopoly and price fixing in that business. The King Amendment limits the refining of gas and its by-products to the "extraction and separation of liquid hydrocarbons therefrom." It is our understanding that this permits only the separation of the liquid from the gas, and does not include "refining" as used in its ordinary meaning.

The former amendment permitted the co-operative marketing and storing of gas without limitation. The King Amendment eliminates the storage of gas and limits the co-operative marketing to situations where it is not possible or practicable, without incurring waste, to deliver same to its owners severally.

The original Bill was silent on the effect it would have on valid orders, rules, and regulations of the Railroad Commission of Texas. The King Amendment specifically provides that all agreements and operations thereunder are subject to all valid rules, orders, and regulations of the Railroad Commission, whenever promulgated.

The King Amendment adds other safeguards. It requires the Commission to define the area to be pooled and the area of common source covered thereby. It limits each unit to one common source of supply, and limits unitization to areas reasonably defined by development. It requires further approval by the Commission of enlargement of the unit.

The King amendment places in the bill a requirement of minimum royalty to the State on its leases, which requirement was omitted from the former Bill.

The King amendment retains the provision that production from any part of the unit will hold all the leases within the unit. A provision has been added, however, that such production must be in paying quantities. A further provision has been added which states that such agreements shall not relieve any operator from the obligation to develop reasonably the lands and leases as a whole committed to the unit.

Taken as a whole, the King amendment substantially meets the objections set out in Opinion V-97 in so far as the antitrust laws are concerned. If any doubt is left, Section 5 of the King amendment settles the question by providing that this Bill shall be held invalid rather than the antitrust laws if any court should find a conflict and unreasonable exception thereto in this Bill.

Article XVI, Section 59a, of the Texas Constitution directs the Legislature to enact laws necessary for the conservation of natural resources. This bill, being founded principally on the necessity for the prevention of waste, the conservation of natural resources, and the protection of correlative rights, will, in all probability, be upheld by the courts. It is our belief that, in its present form, it is constitutional.

Of course, this opinion has nothing to do with the merits of the Bill and is not to be interpreted as an expression in that regard. The matters now within the King amendment are questions of policy wholly within the province of the Legislature.

Yours very truly,

ATTORNEY GENERAL OF TEXAS

By    Joe R. Greenhill
      Joe R. Greenhill
      Assistant

JRG:wb